| WOODARD, Judge.
In October and November of 1997, the Calcasieu Parish School Board (CPSB) held a tenure hearing, concerning twenty-one separate offenses against Ms. Emma Hobbs. At the hearing’s conclusion, it voted to remove her as a tenured classroom teacher, having found her guilty of ten of the twenty-one offenses. Nearly one year later, she appealed this decision to the trial court. In October of 2001, almost three years later, the trial court held a hearing on the matter. The following month, the trial court announced its oral reasons for judgment, reversing the school board’s decision and ordering that Ms. Hobbs be reinstated with back pay. CPSB appeals, alleging that the trial court failed to apply the correct standard of review to its decision. We reverse the trial court and reinstate CPSB’s decision.
‡ ‡
The Calcasieu Parish School Board employed Ms. Emma Hobbs as a special education teacher. It assigned her to Sulphur High School in Sulphur, Louisiana. In a September 9, 1997 letter, the parish school administration charged her with twenty-one specific instances of misconduct, involving willful neglect of duty, incompetency, dishonesty, inefficiency, and breach of the terms and conditions of her employment contract, which occurred over several years.
The charges are:
Offense No. 1. During the 1996-1997 school year, you promoted a Penny Drop Fundraiser for the announced purpose of raising money for your classroom account. You obtained approximately $486.00 in donations. However, you turned in only $181.00. Date and Place. 1996-1997 school year; Sulphur High School.
Offense No.2. In 1995, you participated in the Calcasieu Parish School Board (hereinafter “CPSB”) employees United Way Campaign. You accepted donations for the United Way. You did not turn in all of the cash donations you had collected. During the investigation of this allegation, you initially misrepresented that no one had made donations in the form of cash. Date and Place. September and October of 1995; Place presumed to be Sulphur High School.
Offense No. 3. During the United Way Campaign in the fall of 1996, you solicited donations, gifts, and prizes from various businesses | ¡jn Sulphur by representing that the gifts and prizes would be used in a drawing held for the people who had contributed to the United Way Campaign. You thereafter converted a gift certificate in the amount of $50.00 from “Picture This” to your personal use for your son’s pictures. You also retained a blue denim shirt for your son that had been donated by Citgo. Date and Place. September and October of 1996; Sulphur High School.
Offense No. 4. In 1996, you participated in the CPSB employees’ United Way Campaign. You solicited and received donations for the United Way, but failed to turn in or account for a portion of the cash proceeds. During the investigation of this allegation, you initially denied that anyone had made donations in the form of cash. Date and Place. On or about September and October of 1996; *391 Place presumed to be Sulphur High School.
Offense No. 5. In April, May and August of 1993, and in April and May of 1994, you were simultaneously employed by the CPSB and the Calcasieu Parish Police Jury-Job Training Office (“JTPA”). On numerous occasions you left your classroom without authority and arrived at the JTPA office in Lake Charles prior to the close of school, at times as early as 12:00 p.m. Date and Place. April, May and August of 1993, and April and May of 1994; Place presumed to be Sulphur High School and JTPA office.
Offense No. 6. You used CPSB resources, such as aides, students, and supplies, to make crafts that you subsequently sold to the public. At times, you led purchasers to believe you were collecting proceeds from the sale of those crafts for the benefit of your students and/or CPSB. However, you did not turn in the proceeds from those sales to appropriate CPSB personnel. Date and Place. August, 1995 through May 1997; Place presumed to be Sul-phur High School and Sulphur High School athletic events.
Offense No. 7. From August, 1995 through February, 1997, you frequently instructed and authorized Pam Landry, one of your classroom aides, to run errands for your personal benefit while she was on duty and being paid by the CPSB. These errands typically required Ms. Landry to check your mail box on Houston River Road; to check your post office box; to make personal payments and cash deposits at Bank One; to make personal payments at J.C. Penny; to make personal purchases at Sam’s Club; to make trips to the Catholic Diocese offices in Lake Charles; to make personal trips to various individual and businesses; to pick up church donations; to borrow and repay personal cash loans; to take your son, Jay Hobbs, home from school; to take Jay Hobbs to work; and to take Jay Hobbs on other errands. During the investigation of this allegation, you misrepresented that you “never, ever, never, ever, never,” sent Pam Landry on a personal errand. Date and Place. August, 1995, through February, 1997; Home, post office, Bank One, J.C. Penney, |3Sam’s Club, Catholic Diocese, Jay Hobbs’s employer; Casa Ole in Sulphur; Schillileagh’s in Sulphur; Sulphur High School, off Sul-phur High School.
Offense No. 8. On or about September, 1994 through May, 1997, you obtained travel reimbursement from the CPSB for travel that never occurred and for travel involving shorter distances than the distances you reported. Date and Place. On or about September, 1994 through May 1997; Calcasieu Parish School Board Special Ed facility.
Offense No. 9. On numerous occasions you misappropriated property from the CPSB and fellow employees. For example, you took a stapler from Elaine Koh-ler’s (Sulphur High teacher) classroom. You scraped Ms. Kohler’s name off of the top of the stapler but failed to scrape her name off the bottom of the stapler. You also misappropriated a gift that Ann Duffer (aide) bought for Virginia Pharis (aide). You also misappropriated Hope Bowen’s (former special ed teacher at Sulphur High School) keys. Date and Place. Between August, 1991 and May, 1997; Place presumed to be Sulphur High School.
Offense No. 10. You misappropriated a desk and other items belonging to the CPSB from Sulphur High School and sold them at a personal garage sale. Date and Place. August, 1993 and May, 1994; Ms. Hobbs’s home.
*392 Offense No. 11. You misused classroom time for personal use by doing your son’s homework. You also devoted classroom time on personal telephone calls on a regular basis, even to the point of removing students from the classroom so that you could talk without being overheard. Date and Place.1991 through 1997; Sulphur High School.
Offense No. 12. You failed to account for money you collected while working the gates at school events. On September 1, 1995, you failed to account for $120.00 while working the South Gate at the Sulphur v. Glenn Oaks football game. Date and Place. From August, 1994 through April, 1997 including September 1, 1995; Sulphur High School and Sulphur High School Stadium.
Offense No. 13. You left your classroom prior to the close of school in order to sell collars you had made with a serger to individuals and businesses for personal profit. You sold the collars to individuals and businesses and retained the proceeds. You also required your classroom aide to accompany you even though she was also on duty and being paid by the CPSB. Date and Place. August, 1995 through February, 1997; Off Sulphur High Campus, HP & Associates in Sulphur, Unique Designs in Lake Charles.
[4Offense No. 14. You caused the CPSB to reimburse you for repairs to a serger that did not belong to the CPSB. You misrepresented to the Sulphur High School secretary, Loydel Grosze-Spald-ing, that the serger had been donated to Sulphur High School. Later, when the school attempted to tag the serger as CPSB property, you admitted the serger did not belong to the CPSB. You then obtained payment for the repairs to the serger in the amount of $85.00 on or about January or February of 1996. Date and Place. October of 1995 through February of 1996; Place presumed to be Sulphur High School.
Offense No. 15. You obtained permission to attend a regional conference that you stated was scheduled for February 5, 1997 in Lafayette, Louisiana during regular school time. You and Marcella Rose, the Assistant Principal of Jake Drost School, rode together in Ms. Rose’s car to Lafayette. You did not attend the conference, which was actually scheduled for February 13, 1997 rather than February 5, 1997. Instead, you had lunch in Lafayette and then returned to Lake Charles in Ms. Rose’s car. You did not advise CPSB officials that the conference had not taken place. Moreover, on February 21, 1997, you submitted a travel voucher requesting mileage reimbursement in the amount of $55.18 for traveling to and from Lafayette even though you did not use your vehicle to travel to Lafayette. During the investigation, you misrepresented the date of the conference. Date and Place. February, 1997 and March, 1997; Place presumed to be Sulphur High School, and Lafayette, Louisiana.
Offense No. 16. In 1996, Joanne Le-Blanc (Sulphur High Assistant Principal) told you Citgo had donated $3,000.00 toward publication of a Sul-phur High School Handbook. She then asked you to help raise the remaining $7,000.00 of the cost of publication. Thereafter, in April of 1996, you told Joe Palermo, Jr., that Citgo had donated $5,000.00 for the Sulphur High School Handbook. You also promised Joe R. Palermo, Jr., if he would donate $5,000.00, he would receive advertising in the handbook equivalent to Citgo. In reality, Citgo had donated only $3,000.00 not $5,000.00; and Joe R. Palermo, Jr., did not receive advertising equivalent to Citgo. Thus, you made several misrep- *393 reservations to Joe R. Palermo, Jr. Date and Place.1996; Jackpot Novelty and Sulphur High School.
Offense No. 17. In January of 1997, you obtained a $200.00 donation from Joe R. Palermo, Jr. on behalf of a private charity. You requested that the $200.00 check be made payable to you. You never gave the $200.00 to the charity. When you were discovered, you first denied receiving the $200.00 check. Later, you returned the $200.00 to Joe R. Palermo, Jr. You were able to obtain this donation because of your prior solicitations on behalf of CPSB projects. Date and Place. January and February, 1997; Place presumed to be at Joe Palermo’s office at Jackpot Novelties on Ryan Street in Lake Charles.
| sOffense No. 18. You instructed your students to sell candy for your church’s fundraiser and to return the proceeds to you. This entire project was carried out during school hours. You never received permission for the project from appropriate CPSB personnel. Date and Place. During the 1995-1996 school year; Sulphur High School.
Offense No. 19 You instructed your students to sell candy and return the proceeds to you. This entire project was carried out during school hours for your personal gain. You never received permission for the project from appropriate CPSB personnel. Date and Place. During the 1994-1995 school year; Sulphur High School.
Offense No. 20. Part of your responsibilities have included obtaining the signatures of parents to Individual Education Program (IEP) forms, which set forth the educational program for individual Special Education students. During 1997, you instructed your aide to sign for the parents of two students. Date and Place. January 1997 at Sul-phur High School.
Offense No. 21. In support of your nomination for the “Class Act” award by KPLC-TV, you forged the signature of assistant principal Charles Hansen on a false letter of recommendation on Calca-sieu Parish School Board stationery. Date and Place. November or December 1996; Sulphur High School.
Beginning in October 1997, CPSB heard evidence regarding the charged offenses. It found Ms. Hobbs guilty of ten of them— 1, 2, 4, 5, 7, 8, 11, 14, 15, and 20. Specifically, it determined that she was guilty of willful neglect of her duty and dishonesty. Afterwards, it voted to remove her as a tenured classroom teacher. Nearly one year later, she filed an appeal to the trial court, seeking reversal of CPSB’s decision; reinstatement to her former position as a tenured teacher, together with all rights, tenure, and emoluments; reinstatement of pay from the effective date of her removal, together with legal interest from the date of judicial demand; and for all costs of the proceedings.
At Ms. Hobbs’ request, nearly three years later, the trial court heard the matter and issued oral reasons for judgment. It rejected all of her due process violation complaints. After examining each of the ten offenses for which she had been found guilty, it determined that there was not a rational basis which supported any of the ten charges. Thus, it ordered CPSB to rehire her and pay her for the three years that she did not work.
| fiCPSB suspensively appealed, alleging that the trial court violated the proper standard of review in Ms. Hobbs’ appeal; i.e., instead of showing “great deference” to CPSB and affirming its findings, unless they were arbitrary and capricious, the trial court conducted a de novo trial, and on the basis of a cold record, it substituted *394 its judgment for that of the school board. CPSB argues that when the proper standard of review is applied, its factual conclusions must be upheld and, alternatively, even if the trial court properly reinstated her, it should have allowed a credit or setoff against the back pay award for her earnings at another teaching position, which she had during the same period.
We agree that the trial court did not apply the proper standard of review. Rather, it conducted a de novo review of the record and granted CPSB’s decision little, if any, deference by reversing all ten of its findings.
*****
STANDARD OF REVIEW
In Williams v. Concordia Parish School Board,[1] we stated the applicable standard:
The applicable standard of judicial review of a teacher tenure hearing is whether the hearing was conducted in accordance with the authority and formalities of the Louisiana Teachers’ Tenure Act and whether it is supported by substantial evidence, or is conversely, an arbitrary decision and thus an abuse of discretion. This court must not substitute its judgment for the judgment of the School Board nor interfere with the Board’s bona fide exercise of discretion. The reviewing court is to grant great deference to the School Board’s conclusion and resulting sanction, (citations omitted.)
EVIDENTIARY ANALYSIS OF THE CHARGES
The Penny Drop
|70ffense No. 1. During the 1996-1997 school year, you promoted a Penny Drop Fundraiser for the announced purpose of raising money for your classroom account. You obtained approximately $486.00 in donations. However, you turned in only $181.00. Date and Place. 1996-1997 school year; Sulphur High School.
The trial court stated in its oral reasons for judgment:
The first charge that the school board found Ms. Hobbs guilty of was, during the 1996-1997 school year, you Ms. Hobbs, promoted a Penny Drop fund raiser for the announced purpose of raising money for your classroom account. You obtained approximately $486.00 in donations. However, you turned in only $181.00. That is the complaint. The following facts to me are undisputed, Pam Landry and Joan Provost would sort, count, and roll the coins and after which the coins would be placed in Ms. Hobbs’ drawer. On this point, let me point out the following witnesses testified, Ms. Pam Landry; Pam Henagan who apparently was the auditor, I guess; Ms. Loydell Spalding, Sulphur High School bookkeeper; Jeanie Wisdom, Sulphur High School teacher.. Those were the principal people, Emma Hobbs herself of course. They go on about the factual assessment of the testimony. Ms. Hobbs would take the coins to the bank and get dollar bills for them.[1] The next day she would give them to Pam Landry and she would prepare the necessary accounting slip to Ms. Spalding. Ms. Spalding would assign a janitor, I understand it, to count the money.
Clearly, Ms. Hobbs appears to be in violation of the board policy requiring the deposit of funds on a daily basis. However, in the matter at hand, the *395 charge is misrepresentation or theft, stealing really is what the charge is, and the facts that would be reasonably relevant are those that would tend to lead the school board to believe that Ms. Hobbs took money from the original $480.00 some odd dollars. The fact that the complaint did not say she was being charged with holding the money more than a day but the fact that she stole some money, she returned only $181.00 so they say she stole about $305.00. As stated previously, Ms. Hobbs would take the coins to the bank and convert the coinage to dollar bills. It would seem reasonable that if Ms. Hobbs was to take the funds it would be most likely done at this time, since it was in her possession. If she would’ve taken the money, she would’ve taken it when she had the money to go to the bank to exchange the coins for dollar bills. That’s the best opportune time for her to take the money. Of course, the money was in her drawer but other folks had access to the money in her drawer.
Following the rationale that she could’ve taken the money when she went to the bank to exchange the coins to dollar bills, we will conclude that other parties having possession of the money such as Pam Landry and Joan Provost and Ms. Spalding and even the janitor had an | ¡¡equal opportunity to misappropriate the funds. Well, maybe not so much the janitor because he probably was counting it in the presence of Ms. Spalding, but certainly Ms. Spalding and Ms. Provost and Ms. Landry had an opportunity to take the money. I want to also point out that there’s some testimony that Ms. Landry, shortly after the time, she resigned. She went back into the classroom on a Sunday, she maintained a key to the classroom and she went back there on Sunday. Why, I don’t know, she had already resigned but that was also an opportunity to take some money or at least to do something she had no business doing. I don’t know what she did, but she went back into the classroom.
Stated otherwise, the fact that the collected Penny Drop funds were in the abovementioned party’s possession for some period to time, is enough to incriminate that party according to the school board. This precedent is inconclusive, however, this is the rationale that which the school board followed to sustain the charge of misappropriation of funds against Ms. Hobbs.
The duty of this court is to determine whether or not the administrative board decision was arbitrary and capricious. Webster’s Dictionary defines arbitrary as a choice selected at random without reason. Webster’s Dictionary defines capricious as being synonymous with inconsistent. Taken together, one could determine that the standard of arbitrary and capricious requires that the school board decision be found to have been selected at random without reason or consistency.
Here, Pam Hennigan, [sic] internal auditor, stated that although it was possible for Pam Landry to have misappropriated the funds, and this is found in the transcript of October 14, '97 on page 32 lines 1 through 13 and 25, she chose to believe, without giving any reason, that Ms. Hobbs had shortchanged the Penny Drop. Furthermore, the school board based its decision to incriminate Ms. Hobbs because she had possession of the Penny Drop funds. This is evident because there are no facts which indicate the decision was rendered for any other reason. It would seem logical that the other multiple parties who had possession of the Penny Drop funds should also have been incriminated. *396 Those parties were not incriminated. Thus, the school board rationale upon which its decision was based would seem to be inconsistent.
Looking at the totality of the evidence, the transcripts, and considering the memorandum of the lawyers and the argument of the lawyers the Court finds that as to Complaint Number 1, the Court cannot find the school board had substantial evidence to convict Ms. Hobbs of this theft and find her guilty and that the decision was rather based upon arbitrary and capricious and accordingly the Court will reverse that decision as to Count 1. I cannot find a reason to select Ms. Hobbs as the guilty party as opposed to all the other people that had access to the money. It was also noted as to this complaint that there was testimony |9wherein folks said that there was a machine to sort out coins at the school. Nobody knew about it but the administration, the principal, and folks testified to that and it is logical that Ms. Hobbs would go in to [sic] the back to do it, because she didn’t know about the coin machine in the school. That kind of explains why she did it. I first wondered why it wasn’t done in-house and apparently the machine was there but nobody told the rank-in-file teacher about it. That was the testimony of the administrator that they didn’t tell the rank-in-file teachers.
The record reveals that, with Principal Conner’s permission, Ms. Hobbs conducted a fundraiser, which she called a “Penny Drop” to buy work glasses, gloves, aprons, and bags for Ms. Hobbs’ special education students to use during their jobs under the “Learn and Serve” grant program. She would send milk bottles around to classrooms. Students were invited to drop loose change into them each day for a week. At the end of each day, the classes would turn their money in to Ms. Hobbs.
Ms. Pam Henagan, the auditor who investigated Ms. Hobbs’ offenses, determined that there was no need for the fundraiser because the grant covered work glasses and other materials and that Ms. Hobbs had not used all the funds in the grant.
According to CPBS’s policy, any money collected at school must be deposited with the school office on the same day. Ms. Hobbs was aware of this policy. Nevertheless, she had her aides roll the coins, which she would take home each night. She told them that the front office would not take rolls of pennies and that she had to take the coins to the bank to convert them into bills.
Ms. Loydel Spalding worked at Sulphur High School as the school secretary and was responsible for all of the money turned into the front office each day. She testified that she would receive and accept loose change in the amounts of $600.00 to $1,000.00, each day, and that she had a coin sorter machine in her office which had been there for years. Furthermore, she and her assistant regularly rolled and unrolled coins at the front office.
Although, Ms. Hobbs had estimated that the 1996 Penny Drop fundraiser would raise $500.00, the tally sheets indicated that they had raised $486.00. However, when she only brought back $181.00 to be deposited at the front office, Ms. Pam Landry suspected that Ms. Hobbs had stolen the remaining money. These tally sheets, which had been kept in her filing cabinet at school, disappeared after Ms. Hobbs had been notified of the investigation.
|inMs. Hobbs’ explanation for the discrepancy changed each time that Ms. Hen-agan asked her about it. First, she said *397 that only eight classes participated; therefore, that much money could not have been collected. Then, she said that as many as thirty classrooms participated.
The trial court found that “clearly Ms. Hobbs appears to be in violation of the board policy requiring the deposit of funds on a daily basis.” Nevertheless, it set aside CPSB’s finding because it was possible that someone else could have taken the money. Although, CPSB was not required to exclude all possibilities, we must determine whether there was substantial evidence to support its finding. It is clear that Ms. Hobbs did not need to conduct the fundraiser; that she did not turn in the money at the end of each day to the school, as policy dictated; that she had control of the money, at the close of business; and that, under “her watch,” without an adequate explanation, approximately $305.00 appears to be missing. Accordingly, we find that there was substantial evidence to support CPSB’s finding and reverse this part of the trial court’s opinion.
1995 United Way Donations
Offense No.2. In 1995, you participated in the Calcasieu Parish School Board (hereinafter “CPSB”) employees United Way Campaign. You accepted donations for the United Way. You did not turn in all of the cash donations you had collected. During the investigation of this allegation, you initially misrepresented that no one had made donations in the form of cash. Date and Place. September and October of 1995; Place presumed to be Sulphur High School.
The trial court remarked:
Now, we go to Count 2. In Count 2, the school board charges, in 1995, you participated in the Calcasieu Parish School Board employee United Way Campaign. You accepted donations for the United Way. You- did not turn in all the cash donations you had collected. During the investigation of this allegation, you initially misrepresented that no one had made donations in the form of cash. It appears that this complaint centers around stealing, again, that she didn’t turn in all the donation, in particular the cash donation. However, there is a violation of accepting cash, but apparently she was not found guilty of this and that is not the crux of this particular complaint, Offense Number 2. When I say complaint I mean offense, the school board calls it an offense.
In Petitioner was charged with stealing money during a United Way fund raiser. Specifically, it was said that Ms. Hobbs failed to relinquish United Way donations that were made in cash.
Pam Henagan, internal auditor, testified that contributors to the United Way campaign would give checks or cash directly to Ms. Hobbs, or place those checks or cash directly to Ms. Hobbs, or place those checks or cash in her mail box, give the checks or cash to one of her aides, or give the checks or cash to a student. This again is in the transcript of October 9, 1997 at page 182, line 1 through 24 and there are other places where pretty much the same testimony by other people is given.
We talk about primarily, I think, three people that it is alleged that gave money, cash money. I .think it was three, Martha Dalton, Jeanie Wisdom and the most important person in this offense is Mr. Tommy Thompson [sic]. The donations were made in the form of cash or check. It has been alleged that cash donations from Tommy Thompson, [sic] Martha Dalton, and Jeanie Wisdom were misappropriated by Ms-. Hobbs. Tommy Thompson [sic] testified that he made a $50.00 cash contribution but denied claiming charitable deductions for tax purposes although the witness re *398 called giving the money to Ms. Hobbs. He did not receive any type of receipt for the 1995 donation. The fact that Mr. Thompson [sic] has no physical proof that he gave the cash donation to Ms. Hobbs is of no matter in these proceedings. This is because the school board chose to believe his testimony and they accepted it as fact. Stated otherwise, the reason that the board used to sustain the charge of misappropriation of funds per Mr. Thompson’s [sic] $50.00 is weak and in a court of law would probably be insufficient to sustain the charge of theft. However, because the Court does not sit in the place of the board, the Court is limited to the determination of whether the decision was arbitrary and capricious. The Court must find that the decision regarding Mr. Thompson [sic] was not selected at random without reason or inconsistent with past decisions of like findings of fund misappropriation.
However, the court should be reminded that Mr. Thompson [sic] testified he was currently on sabbatical and I was telling you about the sabbatical thing he had that year and he was going to retire and he had to come back and serve that year out and he was asked whether or not he was going to come back and do that year or had he talked to the school board about having to do that year and he took the Fifth. It is well settled in the law that a witness’ Fifth Amendment plea against self incrimination cannot be used in criminal matters to question his motives or character, however, such is not the case in civil matters. In the matter at hand, it is not unreasonable to believe that the school board and Mr. Thompson [sic] may have some quid pro quo relating to his obligation to return to teach and the unlikelihood that the school board will require him to fulfill this said obligation. But I didn’t really take that into ^consideration because I didn’t find there was sufficient evidence to establish quid pro quo, not having to teach the last year, come back and teach, if he gave favorable testimony to the school board. I did not go there, to use the kid’s lingo. I only went on what was in fact proven or what was not proven.
Let me go back to Mr. Thompson, [sic] let me take these other two lesser people in this offense. Regarding Martha Dalton, she testified that she made a $25.00 cash donation to the 1995 United Way campaign and that said donation was not given directly to Ms. Hobbs, rather said donation was placed in Ms. Hobbs mailbox in the teachers’ lounge which is open and unsecured. Furthermore, Charles Hansen, assistant principal at Sulphur High School, testified he was aware' that money had been stolen from teacher’s mailboxes in the teacher’s lounge. The only fact here is that the money was placed in Ms. Hobbs’ box. This would indicate that at best she had constructive possession of the donation. Had Ms. Dalton stated that she placed the money in the direct possession of Ms. Hobbs, it would be a different situation. However, given the fact that the $25.00 donation was placed in an open and unsecured box and that said box and alike boxes had been in the past susceptible to theft, the reason given by the school board to find Ms. Hobbs guilty of misappropriation is lacking and weak. However, it is not the Court’s place to sit in place of the school board and the school board decision must be shown to be arbitrary or random.
Ms. Hobbs and Ms. Landry gave conflicting testimony in this case regarding this offense. Therefore, it is the school board’s obligation to explain the reason why it chose to select Ms. Landry’s tes *399 timony as true or Mr. Thompson’s [sic] testimony as true while dismissing Ms. Hobbs’ testimony.
The other lady, Ms. Wilson, testified that she gave either $5.00 or $10.00 cash to the 1995 United Way campaign and has no recollection of how the funds were delivered. Notwithstanding, there is no proof that Ms. Hobbs stole the $5.00 or $10.00 that Ms. Wilson donated. She doesn’t know who she gave it to. Did she give it to a student? Did she give it to one of the .other employees, Ms. Landry, or did she leave it in the box? We don’t know.
The most damaging testimony would be that of Mr. Thompson [sic] who said he put the money in Ms. Hobbs hands. Now Ms. Hobbs denied that she received any money from Mr. Thompson [sic]. So, it’s Ms. Hobbs’ word against Mr. Thompson’s [sic] word. The only other scenario would be that Ms. Pam Landry said that she heard Ms. Hobbs saying that Mr. Thompson [sic] gave a cash contribution, I think it might have been in '96 and not in '95 though. In '95, we don’t have that corroboration. So, all we have is the school board accepting Mr. Thompson, [sic] Ms. Wilson, and Ms. Dalton’s word that money was given and that that money was placed in the box and/or given to a | isstudent and even if that’s true, that’s not sufficient to say Ms. Hobbs stole the money. With regard to Mr. Thompson, [sic] if there was not evidence on the other side, then that would be sufficient to find her guilty but she’s saying she didn’t see it. It’s one against one and the statute, the jurisprudence say [sic] it should be substantial evidence. It says substantial. What does substantial mean? It has to be more than equal. As to Offense Number 2, in view of the evidence here, I don’t find that the school board has substantial evidence to find Ms. Hobbs guilty of stealing the United Way money that was donated by these three people and that the ruling was arbitrary and capricious. There was not any reason for it. Why accept Mr. Thompson’s [sic] testimony over Ms. Hobbs? What in particular did the school board use to say “okay, both these people are saying conflicting things, but I choose to believe ■Mr. Thompson [sic]?” They have to give me a reason in the record why the school board, before they made the decision to find Ms. Hobbs guilty, why they would believe Mr. Thompson [sic]. There’s nothing in the record. It’s just that they believed him. With regards to that offense,' the Court reverses the school board.
For the 1995 United Way campaign, Ms. Hobbs volunteered to be the faculty representative to collect donations. She distributed pledge cards to the Sul-phur High School faculty. Each person would indicate the amount of any donation he or she wished to make and whether he or she would donate by payroll deduction, check, or cash. Afterwards, Ms. Hobbs collected all of the pledge cards and placed them in a large envelope, bearing a printed form, which she was required to fill out, designating the amount of donations by payroll deduction, by check, and in cash, which she returned to the United Way.
Ms. Henagan investigated after hearing reports that there were problems with the number of donations returned. She went to the United Way office and pulled all of the teachers’ individual pledge cards and mailed each teacher a letter, asking him or her to verify any donations. Several responded, telling her that they had delivered cash donations to Ms. Hobbs, ranging from $5.00 to $50.00. However, Ms Hobbs never reported these cash donations on the envelope, which she turned into United *400 Way. The teachers who made them testified at the hearing.
The trial court found that the teachers and Ms. Hobbs gave “conflicting testimony ... regarding this offense.” It declared that “it is the school board’s obligation to explain the reason why it chose to select Ms. Landry’s testimony as true or Mr. Thompson’s [sic] testimony as true while dismissing Ms. Hobbs testimony.” On the contrary, the law does not require the board to declare why it believes a | ^particular witness. Thus, the trial court erred. Based on the evidence in this record, it is obvious that Ms. Hobbs received cash donations from other faculty members and did not report them to the United Way.
We find that there was substantial evidence to support CPSB’s decision; that it was not arbitrary; and, therefore, we reverse this part of the trial court’s decision.
1996 United Way Donations
Offense No. 4. In 1996, you participated in the CPSB employees’ United Way Campaign. You solicited and received donations for the United Way, but failed to turn in or account for a portion of the cash proceeds. During the investigation of this allegation, you initially denied that anyone had made donations in the form of cash. Date and Place. On or about September and October of 1996; Place presumed to be Sulphur High School.
Regarding this charge, the trial court stated:
Let me go to Number 4. Number 4 is, in 1996, you participated in the United Way campaign. You solicited and received donations. You failed to account for a portion of the cash proceeds. During the investigation of this alleged offense, you initially denied anyone had made any cash donations at Sulphur High School.
This is just like Number 2 except in this case, Mr Thompson [sic] gave the same $50.00 donation, he failed to claim it on his tax return and he failed to get a receipt. However, in this case, he does not recall whether or not he gave it directly to Ms. Hobbs. This is even weaker than the other one and for the same reasons I gave in Offense number 2, I also use for Offense Number 4. There is no evidence. Mr. Thompson [sic] did not even say that he gave Ms. Hobbs the cash money. We don’t know if he gave it to a student or put in the mailbox. If he put it in the box, it was unsecure and subject to theft according to witnesses. We can’t prove she ever received it or got possession of it and so for even more reason, even weaker than the other one, the Court finds there was no substantial evidence and the school board did not give any reasons why they accepted the testimony of Mr. Thompson [sic]. It comes down to what Mr. Thompson [sic] said because Ms. Hena-gan, the auditor, is an after the fact witness. She’s only saying what she gathered from interviéwing the parties. The school Board, however, chose to accept that Mr. Thompson [sic] may have given cash to Ms. Hobbs and Ms. Hobbs stole the money. That is not substantial evidence for a finding of guilty without reason and there’s no reason in the record why they made that choice. Therefore it’s arbitrary and capricious and the court reverses Offense Number 4.
11fiIn 1996, again, Ms. Hobbs collected United Way contributions, as she had done in 1995. However, she reported and turned in, only, $5.00 cash, which was from a teacher, Audrey Hayes. She did not turn in pledge cards or cash from two other teachers, Mr. Tommy Thomason and Ms. Junene Wisdom. At the hearing, Mr. *401 Thomason verified that he had donated $50.00 in cash, again, this year, and Ms. Wisdom testified that she had donated $5.00 or $10.00 in cash. Additionally, Ms. Joan Provost, one of Ms. Hobbs’ aides, testified that there were a number of cash donations, which teachers had made.
The trial court objected to CPSB’s acceptance of Mr. Thomason’s and Ms. Hen-agan’s testimonies. It found that “[there] is not substantial evidence for a finding of guilty without reason and there’s no reason in the record why they made that choice.” As we previously mentioned, the law does not require that the board members explain why they believed one witness’ testimony over another.
The facts show that Ms. Hobbs collected the cash donations from two people, but these cash donations were not contributed to the United Way Campaign in 1996. We find that there is substantial evidence in the record to support CPSB’s finding and reverse this portion of the trial court’s decision.
The JTPA Job
Offense No. 5. In April, May and August of 1993, and in April and May of 1994, you were simultaneously employed by the CPSB and the Calcasieu Parish Police Jury-Job Training Office (“JTPA”). On numerous occasions you left your classroom without authority and arrived at the JTPA office in Lake Charles prior to the close of school, at times as early as 12:00 p.m. Date and Place. April,, May and August of 1993, and April and May of 1994; Place presumed to be Sulphur High School and JTPA office.
In its reasons, the trial court stated:
Number 5, in April, May and August of 1993, and in April and May of 1994, you were simultaneously employed by the Calcasieu Parish School Board and the Calcasieu Parish Police Jury on the Job Training Office, JTPA. On numerous occasions, you left your classroom without authority and arrived at JTPA in Lake Charles prior to closing of school, at times, as early as 12:00 p.m.
hfiThis complaint is interesting. There is testimony from various people — it’s undisputed Ms. Hobbs went to JTPA office before close of business of school at Sulphur High School. It is also undisputed that on numerous occasions she got permission from the superintendent supervisor. As to this offense, complaint, we had numerous witnesses, Ms. Pam Henagan, the auditor; we heard from Linda Webster, a former aide, who testified that she called JTPA office one day during school hours at approximately 1:30, 1:45 and Ms. Hobbs answered the telephone; Merman Me-nard, assistant principal, he gave permission to leave the school early, recalls at least one occasion when she said she was going to JTPA office; Charles Hansen, another assistant principle; and of course, Ms. Hobbs.
Sulphur High School’s day ends at 3:30 p.m. for teachers and school personnel. The school policy requires teachers to remain on campus during regular hours unless granted permission to leave. In the matter at hand, Ms. Hobbs left the school 22 times before 3:30 p.m. in 1993 and she left the school early at least 24 times in 1994. However, Herman Menard, the assistant principal, was sure that Ms. Hobbs asked to leave school early and recalls at least one occasion where she specifically told him that she was going to JTPA. Furthermore, Charles Hansen, assistant principal, recalled giving Ms. Hobbs permission to leave the school early five to ten times in '93 to go to JTPA and that the request would have been towards the end of the day.
*402 The above stated facts would indicate that Ms. Hobbs was granted permission to leave school early and that the assistant principal was aware that she was leaving to go to JTPA. It would seem that the school board’s finding that Ms. Hobbs left school without permission is without substantial evidence. .For this reason, while there’s no proof that she left with permission every time, we know that she got permission on numerous occasions from different people and that the administration was aware that she was going to JTPA meetings. I don’t find the evidence was substantial that she left without permission. She did, in fact, get paid twice, no doubt about that, for that time she did leave. There’s no doubt about that. But even if the school board’s reason was substantial, and I don’t find that it was, but giving the school board the benefit of the doubt, I don’t think that should’ve been' happening. She should not have been leaving Sulphur High School early to go to a paying job. The testimony is not clear whether or not the administration knew that the JTPA job was a paying job, but I would have to assume they should have known. I don’t think they would’ve thought she was going to the Parish School Board to do some work for free. A reasonable person would assume she was getting paid for it. I think the School Board at that point, the administrators, the principals, should have told her, counseled her, that she can’t do it and to put her on notice it won’t be tolerated, send her a letter perhaps indicating they won’t tolerate it and had she violated the letter, that policy after the letter, then it would be sufficient reason and there would be substantial evidence if [17there was such a letter in the record or reprimand in the record. There’s no such record of reprimand or letter prohibiting her from doing such an act. The rule is not to leave before 3:30 unless you get permission. It’s oftentimes done according to the evidence. They give reason to leave early for all different reasons but in this case there’s consistent leaving early. I don’t think it was right to do so. It was reasonable for the school board not to want to tolerate it, but the way they handled it, the administrative handled it and then used that way of handling it, giving permission and then turn around and file the charge for leaving early, I don’t think that supports substantial evidence record. Even if it does, even if another trier of fact, even if the Court of Appeal or another judge would say that it did, I don’t think it was a basis for termination. The statute allows this court when it finds that the school does have" substantial evidence, the court can still find that the punishment was excessive and rather than send it back to the school board, substitute the punishment, offer another punishment, order another punishment and I will utilize that discretion provided by the statute in this case. While the school board was right to do something about it, termination was not the right thing to do. It would be more proper to reprimand her or to warn her to cease and desist from that type of activity and that’s what I would’ve ordered. She would’ve been required to cease and desist, not termination. I think termination was excessive giving the totality of the circumstances because she got permission from the supervisor. With regards to Complaint Number 5, the Court will reverse the school board for a failure to have substantial evidence and being arbitrary and capricious. Even if it wasn’t arbitrary and capricious, it was excessive punishment and the court will reverse that decision of the school board.
*403 In 1993 and 1994, the JTPA program, which stands for the Job Training Partnership Act, employed Ms. Hobbs. It is a federally funded program that provides employment for disadvantaged youth. The police jury administers the grant. Students get summer jobs, helping repair the schools. Teachers are hired on an hourly basis to line up the jobs before summer, and they supervise the students over the summer months while they work. Normally, the teachers work in the late spring during the last month or two of the school year and are paid by the hour. Thus, they must clock in at the JTPA office when they start work each day.
The typical school day at Sulphur High School ended at 3:30 p.m. However, the JTPA time records established that Ms. Hobbs, often, left school long before the official day ended. In fact, sometimes, she left as early as noon. In 1993, she left twenty-two times and in 1994, twenty-four times. While she claimed that she had permission to leave school early, three different school administrators testified that she did not have permission to leave early every time that she left.
|1RThe trial court opined that she should not have been terminated for this conduct; that it was more appropriate to reprimand her. It said that “It would, be more proper to reprimand her or to warn her to cease and desist from that type of activity, and that’s what I would’ve ordered. She would’ve been required to cease and desist, not termination.” It is quite obvious, from this statement, that the trial court imper-missibly substituted its judgment for CPSB’s.
We find that there is substantial evidence in the record to support CPSB’s conclusion on this offense and reverse this portion of the trial court’s findings.
Using Aides to Run Errands
Offense No. 7. From August, 1995 through February, 1997, you frequently instructed and authorized Pam Landry, one of your classroom aides, to run errands for your personal benefit while she was on duty and being paid by the CPSB. These errands typically required Ms. Landry to check your mail box on Houston River Road; to check your post office box; to make personal payments and cash deposits at Bank One; to make personal payments at J.C. Penny; to make personal purchases at Sam’s Club; to make trips to the Catholic Diocese offices in Lake Charles; to make personal trips to various individuals and businesses; to pick up church donations; to borrow and repay personal cash loans; to take your son, Jay Hobbs, home from school; to take Jay Hobbs to work; and to take Jay Hobbs on other errands. During the investigation of this allegation, you misrepresented that you “never, ever, never, ever, never,” sent Pam Landry on a personal errand. Date and Place. August, 1995, through February, 1997; Home, post office, Bank One, J.C. Penney, Sam’s Club, Catholic Diocese, Jay Hobbs’s employer; Casa Ole in Sulphur; Schillileagh’s in Sulphur; Sulphur High School, off Sul-phur High School.
The trial court’s oral reasons for judgment state:
Regarding Offense Number 7, in Number 7, from August 1995 through February 1997 you frequently instructed and authorized Pam Landry, one of your classroom aides, to run errands for your personal benefit while she was on duty and being paid by the Calcasieu Parish School Board. These errands typically required Ms. Landry to check your mail box on Houston River Road; check your post office box; make personal pay *404 ments and cash deposits at Bank One; to make personal payments on J.C. Penney account; to make personal purchases at Sam’s Club; to make trips to Catholic Dioceses; to make personal trips to various individuals and businesses; to pick up church donations; to borrow and repay personal cash loans; to take your son, Jay Hobbs, |iahome from school. The most incriminating testimony for this offense was Ms. Landry and Ms. Hobbs and there was some testimony — all the testimony in the record regarding leaving to bring Jay Hobbs home, the principal said that he does recall the aide bringing Hobbs home, but Ms. Hobbs didn’t authorize that. Ms. Landry did it because there was some problem with the young Hobbs and he had some problems and he was sent home for whatever reason. The record doesn’t show that the principal said that Ms. Hobbs gave the permission or authorized Ms. Landry to take him home. I don’t know if she was not available, I think, and Ms. Landry took the child home. The rest of the record is just simply Ms. Landry saying she did this and Ms. Hobbs saying, no she didn’t. Whether she did or not, I don’t know. Maybe if there was other evidence, corroborating evidence from some of these people that she was paying loans to and [sic] Sam Club people or the Catholic Diocese. There was some testimony she and Ms. Landry were there at lunch one time but that’s a completely different offense. As to this offense, there’s nobody from the Catholic Diocese [sic] testify that Ms. Landry came there to take care of some business for Ms. Hobbs and there’s nobody who was paid back cash loans saying that Ms. Landry went and paid the back [sic] or to pick up money for Ms. Hobbs so there’s [sic] testimony in the record to corroborate what Ms. Landry says that she was doing. She never complained about making any trips, unauthorized trips or errands for Ms. Hobbs. She could’ve done so. She never documented that she made these unauthorized trips to support her allegations. It comes down to her word against Ms. Hobbs’ word and it goes back to the statute saying substantial evidence. This is not substantial evidence and there’s no reason why the school board did not enumerate its reasons for believing Ms. Pam Landry over Ms. Hobbs. Therefore the court finds there was no reason or there wasn’t substantial evidence and for that reason the court will reverse that decision of the board with regard to Offense Number 7.
Ms. Hobbs emphatically denied to Ms. Henagan that she had ever sent her aide on a personal errand. She even admitted, in the hearing, that teachers may not use aides for personal services. However, Ms. Pam Landry testified that Ms. Hobbs, often, made her run personal errands on a daily basis, including taking her son places, checking her mail, and other personal matters. Another of Ms. Hobbs’ aides, specifically, Debbie Helton, confirmed this fact. Mary Guillory, Dawn Landry, and Monica Richard, also, confirmed that she sent aides on personal errands that were unrelated to school business. Ms. Landry testified that Ms. Hobbs sent her on personal errands three or four days of the week and that, sometimes, she was away from the school all day, running Ms. Hobbs’ errands.
| ¡jnThe trial court said that it was simply a matter of Ms. Hobbs’ word against Ms. Landry’s and that this is not substantial evidence.
The CPSB reviewed all the evidence. It chose to believe Ms. Landry’s testimony. This is within its discretion as the fact-finder. Moreover, other witnesses testi *405 fied to Ms. Hobbs’ actions, which violated school policy in this regard. We find that there is substantial evidence in the record to support this charge and reverse this portion of the trial court’s findings.
False Travel Reimbursements
Offense No. 8. On or about September, 1994 through May, 1997, you obtained travel reimbursement from the CPSB for travel that never occurred and for travel involving shorter distances than the distances you reported. Date and Place. On or about September, 1994 through May 1997; Calcasieu Parish School Board-Special Ed facility.
The trial court stated:
Offense Number 8, on or about September of '94 through May '97 you obtained travel reimbursement from the Calcasieu Parish School Board for travel that never occurred and for travel involving shorter distances than the distances you reported. This offense, complaint, Pam Hennigan [sic] is the auditor, she testified, what the school policy is, that employees are neither to be reimbursed for mileage that they do not travel not to be reimbursed for more mileage than they actually did travel, which makes sense. There’s some allegations basically that Ms. Hen-agan went, apparently she says in her testimony, that she visited with numerous employers of the students in Ms. Hobbs’ class who Ms. Hobbs’ and her aide’s job was to follow-up and see if there’s any problems with these employers with these students and to go on site and visit with the employer and/or the student. They testified as to some of these employers such as Holly Hill Nursing Home, Marilyn’s Flowers Catering, Old Time Variety Store and others, Cameron Hospital, the Food Service Office and Housekeeping at Calcasieu-Cameron Hospital, these employers are the employers where Ms. Hobbs submitted reimbursement for travel that the administration is saying, Pam Hennigan [sic] the auditor is saying she never made. This is based primarily on Ms. Pam Landry’s allegation to Ms. Hennigan [sic]. The problem I have with finding substantial evidence as to this offense is that no one ever called — there were some witnesses called, wait a minute, there was witnesses called in connection with this matter. The board did not give reason as to why they chose to believe Ms. Hennigan’s [sic] unsupported belief as opposed to the eyewitnesses’ testimony of Ms. Wigginton. Ms. Wigginton is the Holly Hill Nursing Home personnel | s^who stated that at least 12 students, I think, worked at the nursing home, that Ms. Hobbs visited at least four times per month. That’s what she testified to. Marilyn Daughtery with the flower shop indicated that she would see Ms. Hobbs at her establishment at least a dozen or more times a school year. John Williams, owner of the Boiling Pot, stated that Ms. Hobbs would not always check in with him when she was there observing her students but she did go. Moreover, John Richard Thibo-deaux, the manager of the Old Time Variety Store, acknowledge that he would see Ms. Hobbs once a week for two weeks in a row and then would see one of the other workers, usually once a week, someone would come in to check on the student. He was always there and he witnessed this. Finally, Mr. Stewart with the Cameron Parish Hospital testified that he would see Ms. Hobbs once or twice a month and talked with her on occasion regarding students. One gentleman, I think may have been the Boiling Post, said he had a problem with a student and Ms. Hobbs came in and they worked out the *406 problem with the student. What I’m saying is, what reason did the school board have to find guilt as to this offense in light of the testimony of these witnesses? Ms. Hennigan [sic] made mention of one place, I forgot which place it was, she had gone to all the places, she never said that these folks said Ms. Hobbs didn’t go there, but she found from her investigation that the reimbursement vouchers were bogus. What was her reason? I don’t know. In light of these witnesses testimony, however, the Court finds that the school board did not have sufficient evidence as to this offense and the decision was arbitrary and capricious, was not only without reason, but was contrary to the evidence presented at the hearing. I can see it would be very difficult to take each reimbursement invoice and go and find the date and time and try. to get that witness to verify did she show up that date and time. Of course, the school board never had any evidence that she did not. They did not take each allegation, each voucher that was in dispute, and go to that particular employer and say “do you recall Ms. Hobbs coming to this site to observe the student or to visit with you on this date?” That was not done. However, Ms. Hobbs did present this evidence that said they remember seeing her. Whether or not that was on the date she submitted the voucher or not, that wasn’t clear to these witnesses testifying to this fact, but it was sufficient to show that the school board did not have sufficient evidence and accordingly the Court will reverse the school board as to this complaint or offense.
To be reimbursed for travel expenses, teachers are required to fill out travel and expense vouchers. They are reimbursed at the rate, which the IRS specifies, which ranging from 29 cents to 31.5 cents per mile, during the relevant times.
Ms. Henagan investigated Ms. Hobbs’ aides’ complaint that she claimed reimbursement for false travel expenses. Ms. Hobbs admitted knowing that school board policy prohibited employees from claiming expenses that they did not incur but 1 ^denied doing so. Nevertheless, Ms. Henagan determined that she had frequently claimed mileage for travel that did not occur and often claimed more mileage than actually incurred on other trips.
The trial court reversed CPSB’s finding, stating that “the board did not give reason [sic] as to why they chose to believe Ms. Henagan’s unsupported belief as opposed to the eyewitnesses’ testimony of Ms. Wig-ginton.” Again, the trial court erred as a matter of law.
Accordingly, we find there to be substantial evidence to support CPSB’s decision and reverse this portion of the trial court’s judgment.
Misusing Classroom Time
Offense No. 11. You misused classroom time for personal use by doing your son’s homework. You also devoted classroom time on personal telephone calls on a regular basis, even to the point of removing students from the classroom so that you could talk without being overheard. Date and Place.1991 through 1997; Sulphur High School.
The trial court remarked:
That goes to Number 11. We’ll now deal with Number 11. Bear with us, we’re going one by one. Number 11, you misused classroom time for personal use by doing your son’s homework. You also devoted classroom time on personal telephone calls on a regular basis, even to the point of removing students from *407 the classroom so that you could talk without being overheard.
There was some testimony that she moved students from the classroom to talk with some other students parents, I think it was, but Pam Henagan, again, the auditor, testified that the Learn and Serve telephone was granted for the purpose of contacting employers and checking on Learn and Serve students. However, Ms. Henagan testified that her audit of the central office indicated that board employees utilized board telephones for personal long distance calls and that none of the central office personnel were charged with wrong doing. This would indicate that the board decision to charge Ms. Hobbs is inconsistent with the normal practice. However, Pam Henagan further investigated this case and testified that Ms. Hobbs spent a great deal of time on the telephone. However, that charge was that she was conducting personal business. Ms. Hobbs was saying that she was not conducting personal business, but she was conducting school business. But, Ms. Henagan found that she was conducting personal business. I | gsunderstand that phone was not in the classroom, you had to go outside of the classroom to use the telephone so, that was taking her outside of the classroom. I don’t know if I’m right on that but from the testimony, I kind of gathered the phone was not in the classroom. Students said that they observed Ms. Hobbs on the telephone and that on occasion she was talking to Learn and Serve employers. I forgot the student’s name but it’s in the transcript and it’s in the transcript for October the 9th '97 at page 33 at lines 1 through 6 and 6 to 9. There were numerous students testifying that they did hear her talk on the phone but none of them said they can verify she was discussing personal business, to the contrary, they said she was talking about some official business from what they could gather from the conversation.
There was some testimony about homework. The only person that testified Ms. Hobbs did her son’s homework on school time was Pam Landry. Mr. Herman Menard, the assistant principal, denied that he had any information concerning Ms. Hobbs assisting Jay with his school homework during school hours. That’s what he testified to. Ms. Lowery, resource teacher, testified that she reviewed some cards or some handwriting, rough draft of papers, all of which were in Jay Hobbs’ handwriting. Further, Ms. Lowery indicated that Ms. Hobbs had [sic] done any of the work on his senior English term paper. She couldn’t verify it, I[sic] think. Ms. Landry was the only person that said that she was doing homework. Why the board chooses to believe her testimony is — I don’t know. I find however, looking at the testimony of all the witnesses that there was not sufficient evidence that she did homework on school time and that as for the telephone, there could’ve been opportunity for the school board to prove she made telephone calls, the long distance school record should reflect that, the telephone record should reflect that, but, we didn’t have anything. It’s one person’s word against another, basically and so I find not substantial evidence that there was not a reason given why they found her guilty of that and it was arbitrary and capricious.
Ms. Hobbs had a telephone installed in her classroom, which the “Learn and Serve” grant paid for, to be used to enable her to check on jobs for her students. It is undisputed that teachers are not to conduct personal business during classroom *408 time. The evidence supports CPSB’s determination that she used the telephone, primarily, for personal matters and was on it for hours, each day. Often, she had her aides remove students from the classroom so that she could talk, privately.
Also, she did her son’s homework during class time. Even the principal, Mr. Gerald Conner, warned her about this. .
The trial court found that “it’s one person’s word against another, basically and so I find no substantial evidence.” However, Ms. Henagan, Ms. Landry, Mr. Conner, l^and some of Ms. Hobbs’ own students testified about this complaint. Thus, we find that there is substantial evidence to support this charge and reverse this portion of the trial court’s judgment.
The Serger Repair
Offense No. 14. You caused the CPSB to reimburse you for repairs to a serger that did not belong to the CPSB. You misrepresented to the Sulphur High School secretary, Loydel Grosze-Spald-ing, that the serger had been donated to Sulphur High School. Later, when the school attempted to tag the serger as CPSB property, you admitted the serger did not belong to the CPSB. You then obtained payment for the repairs to the serger in the amount of $85.00 on or about January or February of 1996. Date and Place. October of 1995 through February of 1996; Place presumed to be Sulphur High School.
The trial court found:
With regards to complaint Number 14, this was an interesting one. You caused the Calcasieu Parish School Board to reimburse you for repairs to a serger that did not belong to the Calca-sieu Parish School Board. You misrepresented to the Sulphur High School secretary, Loydell Grosze-Spalding, that the serger had been donated to Sulphur High School. Later went [sic] to the school attempted to tag the serger, you admitted the serger did not belong to the Calcasieu Parish School Board. You then obtained payment for the repairs to the serger of $85.00.
It’s my understanding that the testimony is that the Calcasieu Parish School Board didn’t pay for the serger but the Learn and Serve program paid for the serger. I think a lady testified at the hearing that there was a receipt submitted and a budget amendment to reflect the cost of the serger but I assume the same rules that apply to the Calcasieu Parish School Board in regard to reimbursement for the serger applies to the Learn and Serve. In other words, it’s got to be property owned by the Learn and Serve or the school board. It was not in this case, that’s quite obvious, it was not owned. This serger belonged to another person, it did not belong to Ms. Hobbs. I had the person’s name. The issue is whether or not the serger was donated to the school or was just simply used by the school and whether or not Ms. Hobbs misrepresented the donation of the serger for the purpose of getting the repairs paid. Sort of like the [sic] amounts to fraud, theft by fraud. You’ve got to show a benefit to the person who you are charging with the fraud, with the act. There’s no benefit to Ms. Hobbs, she didn’t own it, it was owned by Ms. Martha I think it was, she didn’t get the money, the money was used to pay for the repairs. The policy requires that only things which are property of Calcasieu Parish School Board may be | ¡^repaired by the Calca-sieu Parish School Board funds. Although the serger was specifically being used for educational purposes, I think the testimony is that they used it to make collars and buttons and stuff like that and the students use it and so it *409 was no doubt used for the school board Learn and Serve purposes, for the benefit of the Learn and Serve program and indirectly the school board.
Pam Hennigan [sic] testified that the board policy states that personal owned vehicles, wait, that’s another compliant, I’m sorry. I’m going to something else. Going back to Number 14, as I recall the testimony of the witness from, I guess, the bookkeeping department of the Learn and Serve program, whoever keeps the books, she said that it was submitted, there was a notation upon the invoice about donation but nobody knows when it got there or who put it there. There is some testimony that Ms. Hobbs did say it was donated. But, did she say the serger was donated or the use of the serger was donated? I don’t know, but it’s no doubt it was used for the benefit of the program, it was damaged in that process, it was repaired, the budget was submitted through the proper channel and it was approved by the proper channel. The person that approved the budget, I forgot the gentleman’s name, the supervisor of the lady that testified, there’s no testimony as to whether or not he only approved it because he thought it was owned by the school board. That’s not in the record. The only testimony I have is Ms. — what’s the lady’s name that came to testify — Ms. Shelton, Kendra Shelton, she testified all she knew was that it was submitted, it was a bill, on the bill it’s noted donated, but we don’t know who put that on the bill or what they’ve got on the bill, it was submitted through channels, she did not authorize it but her supervisor authorized it and it was paid, the budget was amended to reflect that billing was paid. I don’t find substantial evidence that she acted improperly. However, she may have mislead people to believe, directly or indirectly, that the serger was donated to the school board. I find if that’s the case and the school board can reasonably believe that to be the case based on the testimony, I don’t find however that it was sufficient reason to terminate a person and that I will utilize the discretion in the statute to reverse the school board. Maybe a reprimand or to counsel her that she needs to make sure that the school board owns the property. My problem with termination, my problem with the drastic action of the school board in this case, the school board knew or should have known if the serger was theirs, being used for the benefit for the school board. Ms. Hobbs got no benefit from it. She used it to help the students with projects. So, she had no benefit. I don’t think we need to be so severe even if she misrepresented to the school board to get it paid. It was paid. It was not paid by the school board, it was paid by the Learn and Serve program. No substantial evidence, decision based on capricious and arbitrary. Reversed.
Ms. Henagan received a compliant that Ms. Hobbs had tried to get a serger, a specialized sewing machine, repaired at school expense, by misrepresenting that it Lidiad been donated to the school. However, when told that it would have to be tagged and made a part of the school’s inventory, she said that it had been loaned to the school. Thus, her request for the school to pay for the repair was rejected Subsequently, she used the “Learn and Serve” grant program to pay the $85.00 repair bill. Notwithstanding, Ms. Hena-gan’s investigation established that the serger was never used in the classroom. Instead, the evidence established that Ms. Hobbs used it to make collars that she sold for a personal profit.-
*410 To set aside CPSB’s finding, the court decided that the evidence did not prove theft by fraud, because CPSB did not show that Ms. Hobbs had directly benefitted from her misuse of public funds. However, the trial court erred because Ms. Hobbs was not charged with theft by fraud; but with misuse of public funds; specifically, she used public money for personal gain. Finally, because there is substantial evidence in the record to support this charge, we reverse this portion of the trial court’s decision.
The CONFERENCE
Offense No. 15. You obtained permission to attend a regional conference that you stated was scheduled for February 5, 1997 in Lafayette, Louisiana during regular school time. You and Marcella Rose, the Assistant Principal of Jake Drost School, rode together in Ms. Rose’s car to Lafayette. You did not attend the conference, which was actually scheduled for February 13, 1997 rather than February 5, 1997. Instead, you had lunch in Lafayette and then returned to Lake Charles in Ms. Rose’s car. You did not advise CPSB officials that the conference had not taken place. Moreover, on February 21, 1997, you submitted a travel voucher requesting mileage reimbursement in the amount of $55.18 for traveling to and from Lafayette even though you did not use your vehicle to travel to Lafayette. During the investigation, you misrepresented the date of the conference. Date and Place. February, 1997 and March, 1997; Place presumed to be Sulphur High School, and Lafayette, Louisiana.
The trial court determined:
Now we go to Number 15, you obtained permission to attend a regional conference scheduled for February 5, '97 in Lafayette and the conference was rescheduled for February 13 and you got reimbursed for that trip, didn’t use your car, in fact went in another person’s car and I think the voucher was $55.18. The petitioner is charged with requesting mileage reimbursement for travel occurring in another person’s vehicle. Pam Henagan, the auditor, testified that the board policy stated that “personally owned vehicle shall be subject to the following ... when two |mor more person [sic] travel in the same personally owned vehicle, only one charge shall be allowed for the use of the expenses of the vehicle.” The witness agreed that the policy does not specify to whom the travel allowance should be paid. Furthermore, after Ms. Hobbs hearing and on October 13, 2001, Calcasieu Parish School Board amended this policy which will now state that “only the owner of the vehicle shall be reimbursed.” It was not the case at the time the reimbursement was submitted.
Marcella Rose, owner of the vehicle in question and assistant principal at Le-Blanc Middle School, indicated that she had informed Ms. Hobbs that she did not want to be paid for the mileage. She apparently did not have any problem with Ms. Hobbs being reimbursed. There’s also testimony that Ms. Hobbs was going in her car but she got a flat. Ms. Rose kind of felt bad about that and that may be the reason why she didn’t have a problem with her doing the reimbursement rather than Ms. Rose. But nevertheless, there’s no evidence in the record from anybody’s testimony on cross-examination, Ms. Hobbs, or otherwise, that Ms. Hobbs knew that this meeting of February 5th had been can-celled until February the 13th. There was a request for reimbursement of the February 13th meeting in Lafayette, but unless it can be shown by credible evidence that she knew that this meeting was rescheduled prior to February the *411 5th, prior to the time she went to Lafayette and went anyway and saw an opportunity to get away from school and get some reimbursement and go to Lafayette and shop, then there’s no substantial evidence that she did anything improper. Apparently the school board recognized this by changing its rules. They did go to Lafayette just at the wrong date and it was reasonable to go on that date because it was scheduled for the 5th. So accordingly, evidence was not substantial as to this offense and there was not a reason for a finding of guilt as to this offense. There was not even a violation of the rules. There was an inference, but the school board did not give a reason why you’re going to find Ms. Hobbs guilty of going on a trip that was authorized by the school board to go on when the trip was rescheduled and the meeting was not had. Only one person in accordance with school board rules submitted a voucher for reimbursement and that was Ms. Hobbs, she got it. There’s no prohibition in doing that and the Court will therefore reverse Number 15.
On February 21, 1997, Ms. Hobbs submitted a request for mileage reimbursement and meal expenses for an educational conference in Lafayette, Louisiana. She represented that she had driven there on February 5, 1997, and, therefore, was entitled to be reimbursed for mileage and meal expenses. The school board granted her request and paid her $70.18.
Notwithstanding, the record establishes that she did not use her car for the trip, because it developed a flat tire that morning. Another teacher, Ms. Marcella Rose, 12swhom she had invited on the trip, drove. Moreover, the conference did not take place. When the two reached Lafayette and discovered that the conference was not that day, instead of returning to school, they had lunch and went shopping. Upon their return, Ms. Rose told Ms. Hobbs that she was not claiming any mileage expense because the conference had not taken place.
On March 5, 1997, in their first meeting in Principal Conner’s office, Ms. Henagan asked Ms. Hobbs about this trip. Ms. Hobbs told her that the conference had taken place. However, at the hearing, she denied having been untruthful, saying that she only “evaded” the truth. Later, she defended this by stating that she was not under oath.
Based on the record, we find that Ms. Hobbs submitted a mileage and expense voucher to attend a conference that did not occur on the date that she traveled to Lafayette although she did not use her vehicle; however CPSB paid her for this trip. Accordingly, since there is substantial evidence for CPSB’s findings concerning this offense, we reverse this portion of the trial court’s decision.
The IEP SIGNATURE
Offense No. 20. Part of your responsibilities have included obtaining the signatures of parents to Individual Education Program (IEP) forms, which set forth the educational program for individual Special Education students. During 1997, you instructed your aide to sign for the parents of two students. Date and Place. January 1997 at Sul-phur High School.
The trial court reasoned:
I think 20 is the last one. Complaint Number 20, the petitioner is charged with forging the names of parents, signature on the IEP form. Della Marie Genna, the mother of a special ed student, identified her signature in document 208 at Tab 20 of the black book. However, she has indicated that the signature of Della Genna in the upper left *412 hand córner of the document 204 on page 204 at Tab 20 of the black book was not, in fact, her signature. I guess that black book is the book where you write down the plans, how to deal with the student and it was in that book you had to get some confirmation from the parents, certain people had to sign and she said she didn’t sign the document number 204.
Pam Landry testified that she wrote Della Genna’s autograph on the document which is now numbered 204 and that her actions were ^pursuant to the instructions of Ms. Hobbs. Ms. Hobbs states that she did not order anyone to sign Ms. Genna’s signature, did not sign Ms. Genna’s signature herself and cannot explain the apparent different signatures of Ms. Genna on the form.
There was a whole lot of testimony on cross examination that the plaintiffs lawyer was trying to say that Ms. Landry’s credibility was blown on cross examination but I didn’t get into all of that because like I said I don’t get into credibility and all that stuff because the statute doesn’t allow me to. But, you had Ms. Landry saying that she was told to write the signature and you have Ms. Hobbs saying she didn’t tell her that and there’s no history wherein Ms. Landry complained of having to sign parent’s signatures or anybody else’s signature. Ms. Genna admits that she did go over a plan with Ms. Hobbs. Ms. Hobbs said she signed it and somebody else was there, Hansen or Hinson or I guess it was the supervisor, he said he signed it, but Ms. Genna didn’t sign everything. Somebody signed Ms. Genna’s signature, but we can’t prove who did it. It’s one against the other. What reason is there to accept Ms. Landry’s word over Ms. Hobbs? I don’t know. It was not in the record. The school board didn’t enumerate those reasons. Therefore, there’s no reason. I’m not using the same standard we use in [sic] criminal case because it’s beyond a reasonable doubt but even in civil cases, preponderance of the evidence, is that akin to substantial evidence? Maybe not but substantial means it’s more than equal and this is not more than equal so there’s no substantial evidence and no reason. Therefore the decision is arbitrary and capricious as to this violation.
So as to every violation of guilt that the school board found Ms. Hobbs guilty of, the Court has gone through in detail and tried to analyze, and I might add I tried to analyze it not in the best light of Ms. Hobbs, but rather to support the school board’s position because that’s what the statute says. I give deference to the school board’s discretion and I did. But, when you have the jurisprudence saying substantial evidence, I have to search the record and look for it. I tried to find it. I spent a lot of hours going through the transcript and the law clerk read through the whole transcript, read everything and read the transcript in detail to try to get the understanding of the witness to see if there was any substantial evidence. No substantial evidence, the decision of the Calcasieu Parish School Board is therefore reversed. The Court would order the reinstatement of Ms. Hobbs with her pay.
Ms. Henagan received a report from Ms. Pam Landry that Ms. Hobbs had instructed her to forge a parent’s name on an IEP form. Federal law requires that every special education student’s program of study be reduced to writing and signed by the teacher and the parent. The parent, in question, was Ms. Della Genna, who testified that the signature on the IEP form was not hers. The form, with the forged signature, stated that her son would only receive a “certificate of *413 achievement,” not|3na high school diploma. She had signed an earlier one, indicating that her son would receive a high school diploma.
The trial court erred in finding that Ms. Hobbs’ denial of wrongdoing nullified CPSB’s decision. Nonetheless, its decision to believe one witness and not believe others is a matter within its discretion. It was reasonable for CPSB to conclude, from the evidence, that Ms. Hobbs ordered Ms. Landry to forge Ms. Genna’s signature onto the IEP form.
Accordingly, we find that there is substantial evidence to support its decision and reverse the trial court’s decision on this offense.
The Setoff Issue
The school board argues, in the alternative, that should we uphold the trial court’s decision, it would be entitled to a setoff or a credit against payment of Ms. Hobbs’ back salary for the amounts, which she received from her teaching job in Texas for the same period. However, because of our decision, reversing the trial court and reinstating CPSB’s decision, we find that it is unnecessary to address this issue.
CONCLUSION
The trial court erred in conducting a de novo trial and by not granting deference to the school board’s decision. Thus, we reverse and reinstate the school board’s decision to terminate Ms. Hobbs’ employment and cast her with the appeal’s costs.
REVERSED AND RENDERED.

. 95-980 (La.App. 3 Cir. 1/31/96); 670 So.2d 351, 353, writ denied, 96-0556 (La.4/19/96), 671 So.2d 921.